UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MAUREEN ANN AUBUCHON,            )
                                 )
              Plaintiff,          )
                                 )
         v.                       )      No. 4:09 CV 465 DDN
                                 )
                                 )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                 )
              Defendant.          )

**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Mary Ann Aubuchon for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).  (Doc. 10.)  For the reasons set forth below, the ALJ's decision is affirmed.

**I.  BACKGROUND**

Plaintiff Mary Ann Aubuchon was born on July 9, 1962.  (Tr. 460.) She is 5'7" tall with a weight around 175 pounds.  (Tr. 126.)  She is separated from her husband and has three children.  (Tr. 461, 469.)  She completed high school and did not attend any vocational, technical, trade school, or college.  (Tr. 462.)  She last worked at the Mid Rivers location of Famous-Barr doing inventory control.  (Tr. 137-38.)

On April 5, 2006, Aubuchon applied for disability insurance benefits, alleging she became disabled on December 27, 2003, on account of multiple sclerosis and depression.[1]  (Tr. 16, 127.)  She received a

_____

[1]Multiple Sclerosis is the occurrence of patches of plaque in the brain and spinal cord, causing some degree of paralysis, tremor, and disturbances of speech.  Stedman's Medical Dictionary, 1393 (25th ed., Williams & Wilkins 1990).

notice of disapproved claims on July 3, 2006. (Tr. 72-76.) After a hearing on March 11, 2008, the ALJ denied benefits on June 18, 2008. (Tr. 13-23, 83.) On January 21, 2008, the Appeals Council denied Aubuchon's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 27-29.)

## II.  Medical History

On an unknown date in 1997, Aubuchon was diagnosed with multiple sclerosis (MS) by Dr. Yanover. (See e.g. Tr. 201, 483.) After Dr. Yanover passed away, Aubuchon started seeing Dr. Green for primary treatment for MS. (Tr. 483.)

On January 30, 2003, Aubuchon called the office of Barbara Green, M.D., complaining of headaches and leg pain. Dr. Green's office responded by increasing several medications. (Tr. 327.)

On April 1, 2003, Aubuchon met with Dr. Green, the first visit to her office in the record. Aubuchon complained of headaches and leg pain. Dr. Green reported that they had attempted a variety of drugs with little effect, including Neurontin, Lamictal, Topamax, Imipramine, Methocarbamol, and generic Fiorinal.[2] Aubuchon reported quitting her job, stating that she could not sustain being on her legs and doing the work. She described herself as not "feeling good", and became weepy during the examination. Dr. Green opined that Aubuchon was alert, appeared depressed, but had full strength. Dr. Green further stated that she was not sure if her pain was causing her depression or vice versa. (Tr. 324-25.)

On April 21, 2003, Aubuchon went to St. John's Mercy Medical Center to receive MRIs of her brain, cervical spine and thoracic spine on the

---

[2]Neurontin is used to control seizures and to relieve nerve pain in adults. WebMD, http://www.webmd.com/drugs (Last visited May 20, 2010.) Lamictal is used to prevent or control seizures, and is also used to help the symptoms of bipolar disorder by restoring chemical balances in the brain. Id. Topamax, or Topiramate, is used to prevent and control seizures, and also to prevent migraine headache. Id. Imipramine is used to help control the effects of depression. Id. Methocarbamol is a muscle relaxant used to reduce muscle pain. Id. Fiorinal is a combination medicine (consisting of aspirin, caffeine, and butalbital) used to decrease headache pain and relieve anxiety. Id.

orders of Dr. Green.[3]  Those scans revealed small changes in the brain consistent with the progression of MS, and some evidence of spinal disease.  (Tr. 196-97.)

On August 14, 2003, August 26, 2003, and September 2, 2003, Aubuchon called Dr. Green's office complaining of leg pain and increasing fatigue and drowsiness.  (Tr. 322-23.)

On October 3, 2003, Aubuchon met with Dr. Green to talk about her MS.  However, "the better part of an hour" was spent discussing the difficulties in Aubuchon's marriage and home life.  Aubuchon weeped openly while discussing these issues.  Aubuchon reported continued fatigue, decreased endurance, and leg pain.  She further reported she would fall asleep after her family left for the day, and was unsatisfied with the amount of housework that she was able to do.  Dr. Green prescribed an increased dosage of Keppra to help with headache and leg pain.[4]  She further recommended that Aubuchon seek counseling for her family issues.  (Tr. 320-21.)

On October 8, 2003, Aubuchon sought counseling through her husband's Employee Assistance Program (EAP).  (Tr. 346.)  At this intake meeting, the examiner, Mark Hollinger, noted mild depression and anxiety related to marital, familial, and health issues.  Mr. Hollinger recommended continued therapy for these problems.  (Tr. 349.)

Aubuchon would follow up with Mr. Hollinger at least three times during October and November.  At each of these sessions, Mr. Hollinger noted some improvement.  At the last session on November 19, 2003, Aubuchon reported no depressive symptoms.  (Tr. 353.)

---

[3]The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2 (25th ed., Williams & Wilkins 1990).

[4]Keppra is used to treat seizure disorders.  WebMD, http://webmd.com/drugs (Last visited May 10, 2010.)

On October 14, 2003, and October 21, 2003, Aubuchon called Dr. Green's office to complain of continued fatigue. On the latter occasion, after discussing her MS and depression, Aubuchon felt her fatigue stemmed from the former rather than the latter. On the October 21 call, Dr. Green adjusted Aubuchon's medications. (Tr. 319.)

On November 11, 2003, and November 19, 2003, Aubuchon called Dr. Green's office to complain of continued fatigue. (Tr. 318.)

On February 20, 2004, Aubuchon returned to Dr. Green's office for a follow up on her MS. Aubuchon reported essentially unchanged problems, including severe fatigue that necessitated laying down several times a day, depression, and pain. Dr. Green encouraged Aubuchon to seek the help of a psychiatrist for her depressive illness. (Tr. 315.)

On March 16, 2004, Aubuchon called Dr. Green's office to complain of eye pain and blurred vision. (Tr. 313.)

On March 23, 2004, Aubuchon called Dr. Green's office to complain of weakness in her legs. (Tr. 313.)

On April 15, 2004, Aubuchon returned to Dr. Green's office for a follow up, with largely unchanged problems. This time, Dr. William Logan, M.D., saw her. Aubuchon complained of headaches and pain in her legs. Aubuchon noticed a decrease in her vision. Dr. Logan opined that it was "remarkable" how sad Aubuchon appeared, and stated his belief that her fatigue stemmed from depression. (Tr. 311-12.)

On May 13, 2004, Aubuchon took the advice of Dr. Green and sought psychiatric care from Robin Androphy, M.D. Aubuchon reported fatigue and a lack of energy to Dr. Androphy, who diagnosed dysthymic disorder

and prescribed Effexor and Trazodone.[5]  Dr. Androphy recorded a GAF
score of 60/70.[6]  (Tr. 281-83.)

Aubuchon would revisit Dr. Androphy twice in June on the third and
the twenty-fourth.  Each time, Dr. Androphy observed a nervous or
depressed mood and anxious affect.  Aubuchon also reported slight to
moderate fatigue.  Dr. Androphy continued to prescribe Effexor.  (Tr.
277-79.)

On July 29, 2004, Aubuchon saw Dr. Androphy again.  Aubuchon
expressed irritation about her fatigue and inability to keep her house
clean.  Dr. Androphy noted Aubuchon's mood as good.  (Tr. 275-76.)

On August 31, 2004, Aubuchon returned to Dr. Green's office.  Dr.
Green noted that Aubuchon's complaints continued to consist of pain in
her lower extremities as well as consistent fatigue.  Dr. Green reported
that Aubuchon continued to walk with a slow, somewhat antalgic type
gait.[7]  To check for evidence of continued or new MS activity in her
brain, Dr. Green ordered an MRI scan.  (Tr. 307.)

On September 11, 2004, an MRI scan was completed.  The dictating
physician found activity consistent with Aubuchon's previous MS

---

[5]Dysthymia, sometimes referred to as chronic depression, is a less
severe form of depression.  With dysthymia, depression symptoms can
linger for a long period of time, perhaps two years or longer.  People
who suffer from dysthymia are usually able to function adequately but
might seem consistently unhappy.  WebMD,
http://www.webmd.com/depression/guide/chronic-depression-dysthymia (last
visited August 26, 2009.)  Effexor is an antidepressant used to treat
depression and mood disorders.  WebMD, http://webmd.com/drugs (last
visited May 10, 2010.)  Trazodone is used to treat depression.  Id.

[6]A GAF score, short for Global Assessment of Functioning, helps
summarize a patient's overall ability to function.  A GAF score has two
components.  The first component covers symptom severity and the second
component covers functioning.  A patient's GAF score represents the
worst of the two components.  A score from 61 to 70 represents mild
symptoms (such as depressed mood and mild insomnia), or some difficulty
in social, occupational, or school functioning (such as occasional
truancy, or theft within the household), but the individual generally
functions pretty well and has some meaningful interpersonal
relationships.  Diagnostic and Statistical Manual of Mental Disorders,
32-34 (4th ed., American Psychiatric Association 2000).

[7]Antalgic gait refers to a posture or gait assumed in order to
avoid or lessen pain.  See Stedman's Medical Dictionary, 65, 91.

diagnosis and also noted that her overall appearance was stable since her previous examination. (Tr. 194.)

On September 23, 2004, Aubuchon called Dr. Green's office to complain of continued leg pain. (Tr. 306.)

On November 23, 2004, Aubuchon saw Dr. Androphy. Dr. Androphy noted a good (not depressed) mood and an anxious affect. She continued Aubuchon's prescription for Effexor. (Tr. 273-74.)

Throughout 2004, Aubuchon consulted with ear, nose, and throat specialist William Conoyer, M.D., regarding fluid feelings in her ears. There was no hearing loss found, and Dr. Conoyer ultimately referred Aubuchon to Dr. G. Robert Kletzker. (Tr. 223, 228.)

On January 13, 2005, Aubuchon saw Dr. Kletzker. At the intake session, Aubuchon continued to complain of a "fluid" feeling in her ears. Dr. Kletzker found dry flaking skin in her ear canals, and placed her on topical medications to moisturize and clean her ears. (Tr. 220.)

On January 25, 2005, Aubuchon saw Dr. Androphy, who recorded no fatigue, a good mood, and an euthymic affect. However, Aubuchon did complain of continuing headaches. Dr. Androphy recorded a GAF score of 70 and continued her prescription for Effexor. (Tr. 271-72.)

On March 16, 2005, Aubuchon saw Dr. Green for a follow up for her MRI. Dr. Green reported that Aubuchon was "alert and cooperative" and that her mental status was "unremarkable other than for her depressive affect." Her strength was good. Dr. Green opined that Aubuchon's MS was likely stable based on MRI results, and encouraged Aubuchon to pursue treatment from a pain management specialist. (Tr. 301.)

On March 18, 2005, Aubuchon called Dr. Green's office complaining of increased head and eye pain. Dr. Green responded by prescribing Neurontin.[8] (Tr. 300.)

On March 31, 2005, Aubuchon again called Dr. Green's office to report the Neurontin was having no effect on her symptoms. (Id.)

---

[8]Neurontin is used to control seizures and to relieve nerve pain in adults. WebMD, http://webmd.com/drugs (last visited May 10, 2010.)

On April 14, 2005, Aubuchon saw Dr. Kletzker. Aubuchon complained of pressure in her ears. Dr. Kletzker diagnosed dysequilibrium, sensorineural hearing loss, aural fullness, and prescribed Flonase and Ocean.[9] (Tr. 218.)

On April 19, 2005, Aubuchon saw Dr. Androphy. Dr. Androphy reported good mood, an euthymic affect, and moderate fatigue. Dr. Androphy continued Aubuchon's prescription for Effexor. (Tr. 269-70.)

Throughout early May 2005, Aubuchon called Dr. Green's office several times to complain about persistent pain. On May 12, 2005, Dr. Green gave Aubuchon a referral to a pain management specialist. (Tr. 299.)

On May 20, 2005, Aubuchon saw Gregory Smith, D.O., at Pain Management Services. Dr. Smith observed a regular gait and recorded Aubuchon's complaints of foot pain. He noted marked sensitivity to pain, and prescribed Methadone.[10] (Tr. 200-04.)

On June 10 and July 11, 2005, Aubuchon followed up with Dr. Smith. On both occasions, Aubuchon reported no improvement in her pain, and Dr. Smith increased the dosage of Methadone. (Tr. 205-08.)

On July 19, 2005, Aubuchon saw Dr. Androphy and reported moderate fatigue. Dr. Androphy noted a depressed mood and a flat and anxious affect. In addition, the Doctor recorded a GAF score of 60, and continued the prescription for Effexor.[11] (Tr. 267-68.)

On August 2, 2005, Aubuchon called Dr. Green's office to ask about possible cognition deficits. However, the call segued into a "very lengthy" conversation about her home and marital life. (Tr. 298.)

---

[9]Flonase is used to relieve allergies. Ocean is used to treat a stuffy or dry nose. WebMD, http://webmd.com/drugs (last visited May 10, 2010.)

[10]Methadone is a drug with a narcotic component and is used to treat moderate to severe pain. WebMD, http://webmd.com/drugs (last visited May 10, 2010.)

[11]On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34.

On August 12, 2005, Aubuchon saw Dr. Smith. She reported no improvement in her symptoms, and Dr. Smith decided to stop Methadone treatment in favor of Avinza.[12] (Tr. 209-10.)

On August 23, 2005, Aubuchon returned to Dr. Smith and reported no improvement in her pain. Dr. Smith opined that she seemed more calm and emotionally stable than during her previous visit. Aubuchon expressed a desire to be weaned off narcotics. Dr. Smith prescribed a short, tapering course of MS Contin.[13] (Tr. 211-12.)

On August 23, 2005, Aubuchon saw Dr. Androphy and reported moderate fatigue. Dr. Androphy did not record any mood or affect for this session. (Tr. 265-66.)

On August 30, 2005, Aubuchon saw Dr. Kletzker, who reported no worsening symptoms and prescribed Zoto Otic for her continued issues.[14] (Tr. 218.)

On September 2, 2005, Aubuchon called Dr. Green's office and complained of not feeling well. She also reported a general lack of energy and motivation. (Tr. 297.)

On September 13, 2005, Aubuchon saw Dr. Androphy, who recorded a depressed mood and flat affect. Aubuchon reported increased fatigue, which the Doctor recorded as "moderate." The Doctor also started a prescription for Cymbalta.[15] (Tr. 263-64.)

On September 21, 2005, Aubuchon saw Dr. Green and continued to report a variety of symptoms including leg pain and fatigue. Dr. Green opined that Aubuchon's problems are "mainly depression related" and that

---

[12]Avinza is an opoid medication used to treat moderate to severe long-term pain. WebMD, http://webmd.com/drugs/ (last visited May 10, 2010.)

[13]MS Contin is an opoid medication used to treat moderate to severe long-term pain. WebMD, http://webmd.com/drugs/ (last visited May 10, 2010.)

[14]Zoto Oric is a combination medicine used to treat ear infections. WebMD, http://webmd.com/drugs/ (last visited May 10, 2010.)

[15]Cymbalta, or Duloxetine, is used to treat major depression and anxiety. WebMD, http://webmd.com/drugs/ (last visited May 10, 2010.)

her MS is stable.  Dr. Green further encouraged Aubuchon to continue work with her psychiatrist.  (Tr. 294.)

On September 28, 2005, Aubuchon saw Dr. Androphy and reported moderate fatigue.  Dr. Androphy recorded a depressed mood and flat affect.  Dr. Androphy also continued the prescription for Cymbalta. (Tr. 261-62.)

On October 7, 2005, Aubuchon received a cervical and thoracic MRI. The MRI found no changes from her previous tests.  (Tr. 192-93.)

Over the next several months, Aubuchon continued to see Dr. Androphy.  At each session, Aubuchon complained of moderate fatigue and Dr. Androphy noted a depressed mood and flat affect.  At the session on January 17, 2006, the dosage of Cymbalta was decreased at Aubuchon's request.  (Tr. 255-56, 257, 259.)

Throughout late 2005 and early 2006, Aubuchon continued to receive counseling through her husband's Employee Assistance Program.  (Tr. 358-63.)  The counselor noted moderate impairments with sleep, depression and social relationships, and mild impairment with anxiety, appetite, and cognitive impairment. (Tr. 358.)  Aubuchon repeated reported mental symptoms related to her failing marriage.  (Tr. 363.)

On January 26, 2006, Aubuchon called Dr. Green's office complaining of continued leg pain.  She was told to increase her dosage of Neurontin.  (Tr. 293.)

Aubuchon continued to see Dr. Androphy on a monthly basis with little effect.  Aubuchon consistently reported moderate fatigue, and Dr. Androphy recorded a depressed mood and flat or anxious affect.  On February 15, 2006, Dr. Androphy assigned a GAF score of 55. (Tr. 248, 250, 253.)

Aubuchon also continued to call Dr. Green's office, complaining of continued leg pain.  On several occasions, Aubuchon asked about dosage instructions for her various medications.  (Tr. 286, 291.)

On June 14, 2006, Aubuchon told Dr. Androphy that her spouse was getting his own apartment.  Dr. Androphy reported a tearful affect and a depressed mood.  Her GAF score was recorded as 60.  (Tr. 421-22.)

On June 22, 2006, Dr. Glen Frisch, M.D., completed a Mental Residual Functional Capacity Assessment.  He determined Aubuchon's

ability to understand and remember detailed instructions was moderately limited, and her ability to understand and remember simple instructions was not significantly limited. He further determined that her ability to carry out detailed instructions, maintain attention for extended periods, and regularly attend a schedule event were moderately limited. He also found her ability to complete a work week without psychologically based interruptions and to respond appropriately to changes in the work setting to be moderately limited. (Tr. 373-74.)

On October 26, 2006, Aubuchon had a brain MRI at the request of Dr. Green. That MRI showed no new activity. (Tr. 393.)

Through late 2006 to early 2007, Aubuchon continued to see Dr. Androphy on a monthly basis. Dr. Androphy continuously noted a depressed mood and flat affect, and Aubuchon frequently reported moderate fatigue. Dr. Androphy assigned GAF scores ranging from 55 to 60. (Tr. 419-39.)

On April 24, 2007, Aubuchon saw Dr. Green. Aubuchon complained of continued pain in her eyes and various odd head and leg pains, but also reported that her mood was doing well. Aubuchon still reported that she had to limit her activities (such as cooking from scratch) because of "easy fatigue." Dr. Green again expressed her impression that Aubuchon's MS was remitted, and that her pain and mood were interrelated. (Tr. 392.)

On July 18, 2007, Dr. Androphy prepared a report on the Aubuchon's psychiatric impairment at the request of Aubuchon's counsel. Dr. Androphy opined that Aubuchon's ability to relate to co-workers, interact with supervisors, maintain concentration, function independently, carry out simple instructions (including following medication instructions), behave in an emotionally stable manner, and demonstrate reliability would all be impaired. In addition, Dr. Androphy stated that Aubuchon may fail to report to a job due to depression or MS. (Tr. 397-98.)

On October 19, 2007, Edward Jackson, M.ED., prepared a report of Aubuchon's counseling with the Employee Assistance Program. He noted she had a strained affect and an increase of short term memory loss. He also noted spontaneous tears. (Tr. 439-40.)

On December 9, 2007, Aubuchon again saw Dr. Green. At that visit, Aubuchon confirmed that many of her symptoms were persisting. She complained that she remained very tired during the day, and lacked the motivation to do anything for her children. Dr. Green told Aubuchon that she believed that many of her symptoms were psychosomatic. In response, Aubuchon indicated that Dr. Androphy felt many of her physical symptoms were MS-related and not depression-related. (Tr. 391.)

On December 12, 2007, Aubuchon told Dr. Androphy her main complaint was pain. Dr. Androphy observed a good/nervous mood, anxious affect, and recorded a GAF score of 60. (Tr. 403-04.) The next month, Aubuchon reported being in a good mood with no crying spells. Dr. Androphy recorded a GAF score of 67. (Tr. 401-02.)

On April 17, 2008, David Lipsitz, M.D., prepared a psychological evaluation at the request of the State of Missouri. He diagnosed depression secondary to physical illness and assigned a GAF score of 55. He found her mood to be depressed and her affect flat. He further noted some short term memory problems, and poor concentration. (Tr. 450-53.) When filling out a Mental Medical Source Statement, Dr. Lipsitz found no impaired ability to understand, remember, and carry out instructions. He found mild impairments in Aubuchon's ability to interact with the public, co-workers, and supervisors, and found moderate impairment in her ability to respond appropriately to usual work situations and changes in a work setting. (Tr. 454-56.)

In a function report completed by Aubuchon herself in preparation for her claim, she reported she takes naps in the morning and afternoon; suffers from constant pain; has limitations squatting, bending, standing, walking, sitting, kneeling, and seeing; and does not handle stress well. She reports she is unable to do many tasks around the house to her satisfaction due to fatigue. (Tr. 147-54.) A function report completed by her husband corroborated this account. (Tr. 159-66.)

**Testimony at the Hearing**

The ALJ held a hearing on March 11, 2008. Aubuchon testified that she worked at Famous-Barr for twelve years doing inventory control.

Before that, she worked sales at J.C. Penney's. On December 27, 2003, she quit her job, claiming that she felt fatigued all the time. (Tr. 459-63.)

Aubuchon suffers from this fatigue as a result of MS and depression. She is receiving treatment for MS from Dr. Green, who she has seen for five to eight years. She is receiving treatment for depression from Dr. Androphy, who she has seen for approximately four years. Dr. Green has prescribed Avonex for her MS, and Aubuchon has maintained that medication since 2003. She has also tried a variety of over the counter and prescription pain medications. For her depression, she has taken Effexor, Wellbutrin, Abilify, Detrol. She reports some decrease in anxiety from these medications. (Tr. 464-68.)

Aubuchon and her husband separated two years ago; she hypothesized that event would exacerbate her anxiety and depression. They are not divorced, and he continues to support the family. (Tr. 469.)

Aubuchon has no specific hobbies. She does not belong to any organized activity group, but she does get together with her friends to eat and talk. While she belongs to a church, she is not a member of any church organization such as mission society or choir. She also leaves the house to watch her children's sporting events. (Tr. 471-74.)

Aubuchon is able to lift a gallon of milk in each hand. She gets up around 6:30 to help her children prepare for school, and then goes back to sleep after they leave the house. She then wakes up around 9:00, gets ready for the day, and does chores around the house such as laundry. She is unable to do many chores due to her fatigue; she does not clean or cook as much as she used to, and she sometimes lacks the energy to fold the laundry. Her children frequently run errands for her outside the house. (Tr. 474-77.)

She gets dressed every day, but does not necessarily leave the house. She does not believe she leaves the house every week; she stated that "it depends how [she] is feeling." She usually napped during the day to refresh herself and to recuperate from fatigue. She had no problem being up and about on her feet, and used a stationary bike for fifteen to twenty minutes every other day. (Tr. 477-79.)

When asked about her capabilities, Aubuchon stated she would be able to stand in a stationary position for forty-five minutes, and then would have to sit down for a while. She also stated she would probably be unable to carry weight for a significant portion of the work day. She could walk four to five blocks before the pain in her legs became too great. (Tr. 484-85.) Further, she stated she would not be able to sit through an eight-hour work day, because of both pain and fatigue. (Tr. 487.) She further suffered from crying spells, and a lack of concentration that would affect her ability to follow instructions. (Tr. 489.)

Brenda Young testified as a vocational expert (VE) in response to hypothetical questions posed by the ALJ. In the first hypothetical, the ALJ had the VE assume Aubuchon could lift twenty pounds occasionally, ten pounds frequently, could sit at least six hours in an eight-hour work day, could occasionally climb ramps or stairs but never climb ladders, ropes or scaffolds. The ALJ had the VE further assume Aubuchon would have to avoid heat and full body vibration, as well as perform jobs that did not require close interactions with the general public. Under these circumstances, the VE testified that Aubuchon could not return to her previous work, but could perform small products assembly work. This is considered light or sedentary work, depending on the specific position. The VE provided the representative occupation of small products assembly work, with about 2,500 jobs in the Saint Louis metro area. (Tr. 490-92.)

In the second hypothetical, the ALJ had the VE take the first hypothetical and add the limitation that the individual would miss in excess of two days a month of work for medical reasons. The VE responded that this would preclude competitive employment after a short period of time. (Tr. 492.)

In the third hypothetical, the ALJ had the VE take the first hypothetical and add the limitation that the individual would show up late or leave early at least once a week, at least being absent the equivalent of an additional break. The VE responded that this would preclude competitive employment after a short period of time. (Tr. 492.)

### III.  DECISION OF THE ALJ

The ALJ found that Aubuchon, because of her pain and fatigue complaints as well as her history of depression, had sufficient exertional and mental limitations to prevent her from doing her past relevant jobs.  The ALJ then proceeded to note that the burden was on the Social Security Administration to show there are jobs existing in significant numbers in the national economy that the claimant can perform consistent with medically determined impairments, symptoms, functional limitations, age, education, work experience, and skills, if any.  (Tr. 19.)

The ALJ found that Aubuchon had the residual functional capacity (RFC) to perform sedentary work not requiring: climbing of ropes, ladders or scaffolds; doing more than occasional climbing of stairs and ramps or kneeling, crouching, or crawling; having concentrated or excessive exposure to extreme heat, vibrations, unprotected heights, or dangerous moving machinery; doing more than simple, repetitive tasks; or having more than occasional contact with co-workers, supervisors or the general public.  The ALJ noted that sedentary work requires lifting and carrying no more than ten pounds at a time, and requires walking and standing only occasionally. (Tr. 19-20.) Relying on testimony provided by the VE, the ALJ found there were approximately 2500 sedentary jobs in the St. Louis Standard Metropolitan Statistical Area.  (Tr. 20.)  The VE testified that Aubuchon would be unemployable if she were absent from work two or more days a month, needed more than normal rest breaks two or more times a week, or needed to arrive late or leave the work place early once a week or more because of medical problems.  However, the ALJ did not believe any of these hypotheticals were valid or justified by the preponderance of the medical evidence and opinions in the record. (Id.)

The ALJ gave "substantial benefit of the doubt" in terms of imposing exertional limitations on Aubuchon's RFC.  He found no evidence in the record of physical disability, and noted that her MS was under control with medication.  Further, she has had no surgeries or inpatient

hospitalization.  Although Dr. Lipsitz opined that Aubuchon was limited by physical symptoms, the ALJ minimized his opinion since Dr. Lipsitz does not specialize in that field of medicine.  (Id.)

Nor did the ALJ find that Aubuchon was mentally disabled.  He noted that Dr. Androphy never recorded a GAF lower than 55, and often higher. He further found Aubuchon's condition to not rise to the level of disability because Dr. Androphy's July 18, 2007 statement indicated that Aubuchon was not always compliant with treatment.  (Id.)

The ALJ found the statements of Aubuchon and her husband not credible.  He dismissed her husband's statement, finding that he was not medically trained to offer clinical determinations and his statement was inconsistent with the preponderance of the opinions and observations of trained medical professionals.  The ALJ held that "what a claimant alleges or displays to a lay third party, even to a spouse or close friend or relation, may not be indicative of a true maximum level of physical or mental functioning."  (Tr. 21.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in

death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); <u>Pate-Fires</u>, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987) (describing the five-step process); <u>Pate-Fires</u>, 564 F.3d at 942.

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. <u>Id.</u> Step four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. <u>Id.</u> The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. <u>Id.</u> If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at step five to show the claimant retains the RFC to perform other work. <u>Id.</u> While a consistent work record does weigh in favor of the claimant, the ALJ is responsible for weighing out these factors. <u>Burnside v. Apfel</u>, 223 F.3d 840, 844 (8th Cir. 2000).

In this case, the Commissioner determined that Aubuchon could not perform her past work, but that she maintained the RFC to perform other work in the national economy.

## V.  DISCUSSION

Aubuchon argues the ALJ's decision is not supported by substantial evidence. First, Aubuchon argues that the ALJ erred in finding her testimony not credible. (Doc. 13 at 19). Second, she argues the ALJ improperly gave little weight to the opinions of Dr. Androphy. (<u>Id.</u> at 21.) Finally, Aubuchon argues that the ALJ improperly formulated her RFC. (<u>Id.</u> at 16.)

**Credibility of Aubuchon**

Aubuchon argues that the ALJ erred in assessing her credibility at the hearing. Specifically, Aubuchon argues that the ALJ gave insufficient consideration to the factors set out in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). (Doc. 13 at 19-20.) The undersigned disagrees.

The ALJ must consider a claimant's subjective complaints. Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Polaski, 739 F.2d at 1322). Credibility questions concerning a claimant's subjective testimony are "primarily for the ALJ to decide, not the courts." See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). If an ALJ discredits a claimant's testimony, they must do so explicitly. Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called Polaski factors. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005). These factors include the claimant's work record and observations by third parties and treating and examining physicians regarding: 1) the claimant's prior work history; 2) the claimant's daily activities; 3) the duration, frequency, and intensity of the claimant's pain; 4) precipitating and aggravating factors; 5) dosage, effectiveness, and side effects of medication; and 6) functional restrictions. Id. While these factors must be taken into account, the ALJ does not need to recite and discuss each of the Polaski factors in making a credibility determination. Casey, 503 F.3d at 695.

The ALJ may discount subjective complaints of pain when the complaints are inconsistent with the evidence as a whole. If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination." Casey, 503 F.3d at 696. However, the ALJ may not discount a claimant's allegations of disabling pain simply because the objective medical evidence does not fully support those claims. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003). When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802.

Here, the ALJ explicitly discredited Aubuchon's testimony. (Tr. 20-21.) The ALJ set out the Polaski factors in his decision, and addressed several of the factors in discounting Aubuchon's subjective complaints. The ALJ gave consideration to Aubuchon's work history. Aubuchon had a steady work record up to the date of her alleged disability onset. (Tr. 462-63.) Aubuchon testified that her fatigue would cause her to "collapse" as soon as she returned home from work. (Tr. 463.) She did not cite any specific change in her condition that led her to quit her job. (Id.) The earliest MRI in the record shows only a "very slight" progression of the disease, with further MRIs showing no progression at all. (Tr. 194, 320.) When an individual has previously worked with an impairment, it cannot be considered disabling at present. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

The ALJ addressed Aubuchon's daily activities in his discussion. (Tr. 17.) Aubuchon testified that she cared for three children and attended their sporting events from time to time, rode fifteen to twenty minutes on a stationary bicycle every other day, and attended church about every other week. (Tr. 472-78.) She testified she could feed, dress and bathe herself, drive short distances, do some normal household chores, stand for forty-five minutes at a time, walk four to five blocks at a time, and lift up to thirty pounds with either hand. (Tr. 475-76, 484-85.) This testimony provides evidence that Aubuchon's fatigue was not disabling.

The ALJ also took into account Aubuchon's allegations of pain. He found that Aubuchon's MS was stable. (Tr. 18.) Substantial evidence from the record supports this conclusion. (Tr. 68, 294, 301.) Plaintiff had not visited the hospital in recent years. (Tr. 20.) This evidence indicates that the pain was not disabling.

When questioned about aggravating factors, Aubuchon responded that nothing precipitated the disabling conditions that led her to quit her job. (Tr. 463.) Aubuchon further testified (and the ALJ noted in his decision) that her primary conditions, MS and depression, were controlled by medication without side effects. (Tr. 20, 467-70.)

In her reply brief, Aubuchon argues that evidence which is not explicitly mentioned in the ALJ decision cannot form the basis of a

decision by the undersigned.  (Doc. 24 at 2.)  This is based in the
principle that a reviewing court may not rely on counsel's post hoc
rationalization to support an administrative decision.  <u>Bowen v.
Georgetown Univ. Hosp.</u>, 488 U.S. 204 (1988).  First, the undersigned
does not find the use of <u>Bowen</u> persuasive.  That case involved an
executive agency claiming that it was entitled to deference in its
interpretation of a statute per <u>Chevron</u>.  Here, defendant is not arguing
for a specific interpretation of statutory or administrative law.

Moreover, the court in <u>HealthEast Bethesda Lutheran Hosp. and
Rehab. Ctr. v. Shalala</u>, 164 F.3d 415, 418 (8th Cir. 1998), clarified
that the post-hoc rationalization rule applies only when the agency
"fails to make a necessary determination of fact or policy."[16]  The
instant case does not involve such a failure.  The evidence cited as
post-hoc rationalization was in the administrative record, and although
it was not explicitly cited to by the ALJ, all parts of the record were
carefully considered.  (Tr. 16.)  Finally, judicial review of the ALJ's
decision requires examination of the record as a whole.  <u>Pate-Fires</u>, 564
F.3d at 942.  It is therefore the responsibility of the reviewing court
to examine the entirety of the record to determine if there is
substantial evidence supporting the ALJ's decision.

**Weight Given to Dr. Androphy's Statements**

Aubuchon argues the ALJ failed to properly weigh the opinion of Dr.
Androphy.  In particular, she argues that the ALJ failed to give
sufficient weight to: 1) Dr. Androphy's medical records that show
persistent fatigue and 2) Dr. Androphy's report dated July 28, 2007,
stating that Aubuchon has difficulty completing tasks and may have
problems reporting for work.  (Doc. 13 at 21.)  The undersigned
disagrees.

The ALJ has the role of resolving conflicts among the opinions of
various treating and examining physicians.  <u>Pearsall v. Massanari</u>, 274
F.3d 1211, 1219 (8th Cir. 2001).  The ALJ may reject the conclusions of

---

[16]The court in <u>Healthcare Bethesda</u> attributes the post-hoc
rationalization rule to <u>Sec. and Exch. Comm'n v. Chenery Corp.</u>, 318 U.S.
80 (1943).

any medical expert if they are inconsistent with the record as a whole. Id.

The opinion of a treating physician is accorded special deference in Social Security regulations. A treating physician's opinion is entitled to controlling weight where "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009) (quoting Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005)).

Here, the ALJ had access to other inconsistent evidence, allowing him not to grant the statements controlling weight. Dr. Androphy's report noted that Aubuchon was not always compliant with treatment. (Tr. 397-98.) A claimant's noncompliance with treatment constitutes evidence that is inconsistent with a physician's medical opinion, and thus can be considered in determining whether to give that opinion controlling weight. See Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008). Given that the statement did not require controlling weight, the ALJ was justified in giving less weight to Dr. Androphy's opinion regarding Aubuchon's fatigue since it was based largely on her subjective complaints rather than objective medical evidence. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007). In addition, Dr. Androphy's answers on the one-page form were short answers, with no accompanying medical support or analysis to support the summary conclusions. A conclusory diagnosis letter does not overcome substantial evidence to the contrary. See Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992)

Given Aubuchon's noncompliance with treatment, the subjective nature of the complaints, and the conclusory nature of Dr. Androphy's answers, the ALJ did not err in failing to completely accept the statements provided by Dr. Androphy.

**Residual Functional Capacity**

Aubuchon argues the ALJ erred in formulating her RFC. Specifically, Aubuchon argues that the ALJ failed: 1) to provide a narrative discussion of the RFC determination; 2) to take into account

certain medical problems found in the record; and 3) to cite specific medical evidence in support of the RFC. (Doc. 13.) The undersigned disagrees.

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. <u>Casey</u>, 503 F.3d at 696. The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. <u>Pearsall</u>, 274 F.3d at 1217-18. Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. <u>Id.</u> Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. <u>Casey</u>, 503 F.3d at 697; <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

Evaluating mental impairments is often more complicated than evaluating physical impairments. <u>Obermeier v. Astrue</u>, Civil No. 07-3057, 2008 WL 4831712, at *3 (W.D. Ark. Nov. 3, 2008). With physical impairments, evidence of symptom-free periods offers strong evidence against a physical disability. <u>Id.</u> With mental impairments, evidence of symptom-free periods does not mean a mental disorder has ceased. <u>Id.</u> Mental illness can be extremely difficult to predict, and periods of remission are usually of an uncertain duration, marked with the ever-pending threat of relapse. <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001).

Aubuchon first argues that the ALJ failed to provide a "narrative statement" of each aspect of the RFC determination. (Doc. 13 at 17.) Social Security Ruling 96-8p requires that "[t]he RFC assessment include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations.)" Social Security Ruling 96-8p, 7 (1996). In addition, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." <u>Id.</u> An ALJ is not required to make explicit findings for every aspect of the RFC. <u>Depover v. Barnhart</u>, 349 F.3d 563, 567 (8th Cir. 2003.)

Social Security Ruling 96-8p does not say that the ALJ is obligated to provide a narrative discussion immediately following each limitation in the RFC; merely that the ALJ must provide a narrative for the conclusion reached.

Here, the ALJ provided a narrative summary of the evidence explaining the various mental and physical limitations that the ALJ placed on Aubuchon, as well as explaining how those limitations limit her to sedentary work. (Tr. 19-20.) In addition, the ALJ explained how the inconsistencies with regard to Aubuchon's alleged depression- and pain-related issues were resolved. (Tr. 20-21.) Although it may have been preferable for the ALJ to make a specific finding for each constituent part of the RFC, failure to do so will not mandate reversal of his decision. Depover, 349 F.3d at 567.

Second, Aubuchon argues the ALJ's assessment is not supported by medical evidence, specifically that the RFC assessment failed to take into account several of Aubuchon's physical symptoms. (Doc. 13 at 18.) In general, it is the ALJ's responsibility to determine the RFC based on all relevant evidence, including medical records, observations of treating physicians, and the claimant's descriptions and observations of their limitations. 20 C.F.R. § 404.1545(a)(3); Pearsall, 274 F.3d at 1218. The ALJ need only consider all complaints; he is free to discount them pursuant to the law established in Polaski. Therefore, if an ALJ does not find an alleged impairment credible, he need not factor it into a claimant's RFC.

Here, Aubuchon alleges that the RFC failed to incorporate several of Aubuchon's complaints including headaches, fatigue, severe depressive symptoms, and general pain. (Doc. 13 at 18.) However, defendant correctly notes that these are recitations of subjective allegations. (Doc. 20 at 17-18.) While these symptoms are consistent with the diagnoses of her treating doctors, the ALJ's ability to determine credibility extends to determining the extent of those symptoms. See Guilliams, 393 F.3d at 802. The ALJ found that Aubuchon's allegations were not credible to the extent they prevented her from performing all sustained work activity. (Tr. 20.) Per the analysis above, The ALJ

acted properly in finding Aubuchon's testimony not fully credible. Therefore, his decision was valid.

Moreover, the ALJ did rely on Aubuchon's statements to the extent he found she is unable to perform her past work and limited her to sedentary work subject to certain conditions. (Tr. 19.) Specifically, he excluded work doing more than simple, repetitive tasks; having more than occasional contact with co-workers, supervisors, or the general public; or lifting or carrying no more than ten pounds at a time and occasionally lifting or carrying small articles such as docket files, ledgers, and small tools. (Tr. 19.)

Aubuchon argues that the ALJ failed to address her sitting limitations in formulating her RFC. (Doc. 13 at 18.) However, Aubuchon's testimony is contradictory and the ALJ properly evaluated her limitations. Aubuchon testified that she spent most of her day on the couch. (Tr. 477.) In addition, when asked if she would be able to sit through an eight-hour work day, she focused on her mental (not physical) limitations saying, "sometimes I don't think so. It would make me anxious." (Tr. 487.) The ALJ did not give very heavy weight to her mental problems, given Dr. Androphy's consistent GAF scores of 55 and above. (Tr. 19.) Aubuchon also noted her legs would "buzz and pop." (Tr. 487.) Given the non-committal nature of her response, the ALJ was justified in determining that Aubuchon was capable of sitting for a regular workday. (Tr. 19-20.) Further, given that this complaint was self reported, it is subject to the same credibility analysis as above.

Finally, Aubuchon argues that the ALJ's failure to cite specific medical evidence in support of specific RFC findings, specifically her lifting abilities, is in error. (Doc. 13 at 18.) Aubuchon cites Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004), and Social Security Ruling 96-8p for this principle. However, Frederickson merely states that the RFC determination must find support in the medical evidence. Although obligated to develop the record fully and fairly, an ALJ need not discuss every piece of evidence submitted. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Simply because the ALJ does not cite specific evidence does not indicate it was not considered. Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000). In addition, the ALJ

need not discuss how each individual part of the RFC determination was made. _Depover_, 349 F.3d at 567.

As per analysis above, the ALJ's decision is supported by substantial evidence on the record, including medical evidence. The ALJ cited testimony that he found credible indicating that Aubuchon suffered from a limited ability to lift heavy objects. (Tr. 17.) In addition, the ALJ fulfilled the requirement of citing specific medical evidence in the RFC determination when he reviewed Aubuchon's treatment history. (Tr. 18-19.) As per _Black_ and _Craig_, the lack of specific citation for every part of the RFC determination is not dispositive. Although it may have been preferable for the ALJ to have made an explicit finding for each of Aubuchon's limitations, the lack thereof does not mean that aspect was not carefully considered. _Depover_, 349 F.3d at 567. The ALJ's failure to discuss each part of the RFC determination will not mandate reversal. _Id._

In her reply brief, Aubuchon again argues defendant improperly cited evidence that could have supported the ALJ's decision, but was not specifically cited in it. (Doc. 24 at 3.) Aubuchon's argument here is functionally identical to the argument made regarding her credibility determination. Therefore, the analysis articulated above applies here.

Aubuchon briefly argues that the ALJ did not adequately discuss his reasons for finding that Aubuchon could stand more than forty-five minutes at a time despite her testimony. (Doc. 13 at 18.) The ALJ's determination limiting Aubuchon to sedentary work, which limits the claimant to occasional standing and walking, corresponds with Aubuchon's walking and standing impairments. (Tr. 20,) 20 C.F.R. § 404.1567(a). Moreover, Aubuchon herself testified that she has no trouble being up and about on her feet. (Tr. 478.) Since the ALJ did not make a finding adverse to Aubuchon's testimony in this instance, the undersigned finds no grounds for reversal on this point.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on July 19, 2010.